Linda S. **KENNEDY**, Appellant,

v.

Margaret M. **HECKLER**, Secretary, Department of Health & Human Services, Appellee.

No. 83–2143.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1984.

Decided July 18, 1984.

Leonard A. Sandler, Legal Aid Bureau, Inc., Chestertown, Md., for appellant.

Nathan K. Kobin, Dept. of Health and Human Services, Baltimore, Md. (J. Frederick Motz, U.S. Atty., A. George Lowe, Chief, Disability Litigation Branch, Baltimore, Md., on brief), for appellee.

Before WIDENER, PHILLIPS and SPROUSE, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Linda S. Kennedy appeals from a judgment of the United States District Court for the District of Maryland affirming the final decision of the Secretary of Health and Human Services (Secretary) denying Kennedy's application for Social Security Disability Insurance benefits and Supplemental Security Income benefits. Because we conclude that the Administrative Law Judge (ALJ) misapplied the Secretary's regulations governing the evaluation of mental impairments, we reverse the judgment of the district court and direct the Secretary to award Kennedy benefits.

I

Kennedy filed her application for Social Security Disability Insurance benefits on July 16, 1980. On April 13, 1981, she simultaneously refiled for disability benefits and filed for Supplemental Security Income benefits. Initially, and on reconsideration, the applications were administratively denied. Kennedy then timely requested a hearing before an ALJ.

At the hearing, Kennedy testified that she was born in 1950 and had received a ninth grade education. She then obtained vocational training from the Benedictine School and now resides in a group home. She worked in a nursing home from January of 1971 until September of 1977. Her duties included those of domestic worker and nurse's aide. From September 1979 to March 1980, she worked as a teacher's aide at the Denton Child Development Center. There she assisted the teachers with the care and teaching of children two years of age. She also worked as a domestic worker in a hotel from February of 1980 until March of 1980. She obtained employment as a "line worker" in a chicken plant in October of 1980. Kennedy testified that she could not maintain any of these jobs because she could not perform them quickly, efficiently, and did not understand her duties.

Kennedy testified that she takes medication for epileptic seizures and that her treating physician prescribed tranquilizers for her nervous condition. Currently, she works as a volunteer at a Developmental Center, helping the cook in the kitchen and arranging flowers. She works approximately five hours per week. Kennedy goes to church, receives visitors at the home in which she resides, and occasionally goes dancing. Prior to living at the home, Kennedy lived with her father and other relatives.

Medical evidence showed that Kennedy suffered from severe childhood diseases, underwent multiple surgical operations, and had been vocationally and psychologically evaluated continuously since infancy. At age five or six, Kennedy was a victim of polio, her appendix was removed in 1966, and a hysterectomy performed. She has a history of headaches, stomach aches and chronic nervousness. Recently she had surgery for gall stones and was hospitalized again in December of 1980 for gall bladder removal.

Kennedy was diagnosed as having Idiopathic epilepsy since 1953. That condition is now controlled by medications. She has a seizure disorder, diagnosed by her treating physician, Dr. Terry P. Detrich, to be "compatible with diffuse brain disorder." The organic nature of the disorder was reiterat-

ed by consulting psychologist, M.E. Sumner, who noted "strong evidence of rather severe organic brain damage." This diagnosis was confirmed by Dr. Bruce D. Hutchinson, consulting psychologist. Further, Kennedy is impaired by uncontrollable shaking causing her to walk at an ataxic gait. She is also hindered by having to drag her left foot. The physical manifestations of the brain damage and retardation are accompanied by psychological impairments.

The results of Kennedy's evaluations testing her IQ, intellectual, emotional, social and vocational functioning levels were entered into evidence. Psychologist James M. Ballard administered the Wechsler Adult Intelligence Scale (WAIS) in 1966. Kennedy's IQ scores were Performance-55; Verbal-69; and Full-Scale-59. In 1969, Dr. Sumner obtained a Performance score of 63, Verbal score of 87, and a Full-Scale score of 75. Dr. Hutchinson, in 1981, obtained a Performance score of 65, Verbal score of 79, and a Full-Scale score of 72.

Kennedy was also evaluated by Karen Fisher at the Chesapeake Center, Inc. Fisher noted that Kennedy was slow to join in conversations with her co-workers although she eventually held conversations with others. Her verbal skills indicated that she would be able to read and write at a fourth grade level and could possibly improve her skills with experience. Kennedy had difficulty retaining information. Her productivity and motor skills were quite low. She could tell time, count, and handle simple money transactions. However, she had problems in identifying and using tools, conforming to basic safety concepts, and gauging various measurements. It was concluded that:

> The staff at the Center recommends that Linda stay in the Caroline Developmental Unit where she is currently placed. Although Linda's evaluation profile indicates her abilities are in the high extended range, she does not retain information well. Linda requires extended time to complete job tasks and respond to test questions (many of the Center's tests are

not timed). Linda worked a 9½% and earned $.37/hr. at the Center on large and small discs and blocks. This indicates, along with her limited retention, that Linda does not have the capacity to maintain a job.

Ms. Carol Callaway, a counselor for Caroline County, testified that she had been counseling Kennedy for approximately two years. She stated that Kennedy's memory appeared to be failing and that she had failed to improve her vocational skills notwithstanding the training she had received. It was Callaway's opinion that Kennedy would not be able to maintain a job due to her inability to keep up with minimally accepted standards. Callaway also testified that Kennedy is presently involved in a sheltered work environment, but that she will be unable to continue in that environment if she cannot meet the minimal performance standard.

Dr. Deitrich, Kennedy's treating physician, concluded that she was "essentially disabled and unemployable." His final diagnosis was that she suffered from (1) arrested hydrocephalus, (2) mental retardation (mild), and (3) controlled seizure disorder.

Based on the foregoing evidence, the ALJ found that although Kennedy suffered from a severe impairment, her condition did not constitute the medical equivalent of the impairments listed in the regulations. He also found that Kennedy retained the residual capacity to perform her relevant past work as a nurse's aide and domestic worker. Finally, the ALJ concluded that "[t]he Claimant retains the functional capacity to perform a wide range of substantial gainful work activity in a protective and non-stressful setting."

On this finding of a lack of disability, the ALJ denied Kennedy's claim for benefits. The Appeals Council affirmed the decision of the ALJ on April 5, 1982. On appeal in the district court, judgment was entered in favor of the Secretary after a finding by the court that the Secretary's decision was supported by substantial evidence.

## II

In *Hall v. Harris*, 658 F.2d 260 (4th Cir.1981), we summarized the proof scheme by which claims for disability benefits under current Social Security Administration regulations are to be determined. A claimant bears the burden, under the Act, of proving a disability, 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1502 (1980), "which is defined by statute as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; ..." (citation omitted). *Id.* at 264.

The new regulations establish a sequential evaluation process that requires the ALJ, at the third step in the inquiry after a finding that the claimant suffers from a severe impairment, to determine whether that impairment meets or equals the medical criteria found in the Listing of Impairments in Appendix 1. If it does, a finding of disability without consideration of vocational factors is mandated. If, and only if, the impairment is not among or the medical equivalent of those listed in Appendix 1, the ALJ must then determine whether the impairment prevents the claimant from performing her past relevant work. The claimant, by establishing either a listed impairment or the inability to perform past work, makes out a prima facie case shifting to the Secretary the burden of going forward with the evidence.

## III

In the present case, the ALJ found that the claimant did suffer from a severe impairment, but that the impairment was not so severe as to constitute the medical equivalent of any of the impairments listed in Appendix 1. On the basis of the medical and vocational evidence contained in the record, the ALJ ultimately found that the claimant, as a result of her impairments, was not precluded from performing her past relevant work as a nurse's aide and domestic worker. Concluding that the claimant could engage in substantial gainful activity, he denied claimant's application for Disability Insurance benefits and Supplemental Security Income benefits.

We conclude, however, that the ALJ plainly misapplied the Secretary's regulations in determining that the claimant's impairment was not so severe as to constitute the medical equivalent of an impairment listed in Appendix 1. The evidence supports the conclusion that the claimant's major deficiency is mental retardation. In order to establish, under the regulations, a disability based on mental retardation, the claimant must come forward with proof satisfying the requirements of 20 C.F.R. Part 404, subpart P, § 12.05 which reads:

12.05. *Mental retardation.* As manifested by:

A. Severe mental and social incapacity as evidenced by marked dependence upon others for personal needs (e.g., bathing, washing, dressing, etc.) and inability to understand the spoken word and inability to avoid physical danger (fire, cars, etc.) and inability to follow simple directions and inability to read, write, and perform simple calculations; or

B. IQ of 59 or less (see 12.00B4); or

C. IQ of 60 to 69 inclusive (see 12.-00B4), and a physical or other mental impairment imposing additional and significant work-related limitation of function.

The above regulation must be read in conjunction with 20 C.F.R. Part 404, subpart P, Appendix 1, § 12.00(B)(4), which reads, in relevant part:

Unfortunately, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual function. In this connection, it may be noted that on the WAIS, perhaps currently the most widely used measure of intellectual ability in adults, IQ's of 69 and below are characteristic of approximately the lowest 2 percent of the general population. In instances where other tests are administered, it will be necessary to convert the IQ to the corresponding percentile rank in the general popula-

**172**

tion in order to determine the actual degree of impairment reflected by the IQ scores. *Where more than one IQ is customarily derived from the test administered, i.e., where Verbal, Performance, and Full Scale IQ's are provided as on the WAIS, the lowest of these is to be used in conjunction with 12.05.* (Emphasis supplied.) Relying on a WAIS full scale IQ score of 72, the ALJ found that the claimant did not meet the requirements of § 12.05. The WAIS IQ test, however, produces three separate scores measuring verbal and performance skills as well as giving a full scale score. Claimant's scores on the verbal and performance prongs of the test were 79 and 65, respectively. The regulations, § 12.00(B)(4), mandate that when a single IQ test produces multiple scores, the lowest score is to be used in conjunction with § 12.05. *See Grant v. Schweiker,* 699 F.2d 189 (4th Cir. 1983). Claimant's performance score of 65 met the threshold requirement of § 12.-05(C) and required further analysis of the evidence on record to determine her disability.

Once it is established that the claimant's IQ falls within the range required by § 12.05(C), the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions. There is ample evidence in the record that supports a finding that the claimant does suffer from such additional impairments. Testimony before the ALJ established that claimant's productivity and motor skills were quite low and that she suffered from emotional problems that could effect her competency to work. Claimant had problems "identifying and using tools, conforming to basic safety concepts, and gauging various measurements." One evaluator recommended, giving cogent, undisputed reasons for the recommendation, that Kennedy remain in the developmental unit where her limitations could be accommodated. The record also contained letters from claimant's past employers indicating that she was motivated to do the job, but simply could not keep the required level of speed and efficiency.

The ALJ failed to give this evidence proper consideration in light of his reliance on claimant's IQ score falling outside of the requirements of § 12.05. We conclude that the claimant met the requirements of § 12.05 and is disabled.

We reverse the judgment of the district court and direct the Secretary to award those benefits to which Kennedy is entitled by virtue of the disability indisputably proven.

REVERSED AND REMANDED FOR AWARD OF BENEFITS.